## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br><br>**Bootjack Dairy M&D, LLC,**<br><br>　　　**Debtor.** | **Bankruptcy Case No. 23-40226-JMM**<br><br>**Chapter 12** |
| In re:<br><br>**Bootjack Dairy, Inc.,**<br><br>　　　**Debtor.** | **Bankruptcy Case No. 23-40227-JMM**<br><br>**Chapter 12** |

## MEMORANDUM OF DECISION

**Appearances:**

D. Blair Clark, Boise, Idaho, Attorney for the Debtors.

Kim J. Trout, Trout Law, PLLC, Boise, Idaho, Steven L. Taggart, Olsen Taggart PLLC, Idaho Falls, Idaho, and Steven F. Schossberger, Trout Law, PLLC, Boise, Idaho, Attorneys for Black Butte Ranch, LLC.

### Introduction

Before the Court are Black Butte Ranch, LLC's ("Black Butte") motions to

dismiss Bootjack Dairy M&D, LLC ("LLC") and Bootjack Dairy, Inc.'s ("Inc.,"

collectively the "Debtors") chapter 12 bankruptcies as bad faith filings. Also before the

Court are LLC and Inc.'s motions to reject a purchase and sale agreement they entered into that was later assigned to Black Butte.[1]   The Court held an evidentiary hearing on the motions on June 30, 2023, which was continued to July 20, 2023.   At the initial hearing, the Court heard testimony from the principals of the Debtors, Doug and Mark Kerner and the principals of Black Butte, Karl Studer and Matthew Darrington.   At the continued hearing, the Court heard testimony from the Debtors' accountant, Audra Wagner, and Mr. Studer again.   Numerous exhibits were admitted at the hearings, many by stipulation. The parties submitted written closing arguments on August 4, 2023.   LLC Doc. Nos. 82 & 83, Inc. Doc. Nos. 104 & 105.   The Court then took the matter under advisement. Having considered the evidence and arguments made by the parties, this decision sets forth the Court's findings, conclusions, and reasons for its disposition of the motions. Rules 7052 and 9014.[2]

## Background

*A) Prepetition events: the Debtors, Black Butte, the purchase and sale agreement, and the state court litigation*

---

[1]  Black Butte filed its motions to dismiss on June 9, 2023, LLC Doc. No. 22 & Inc. Doc. No. 36, the Debtors filed objections, LLC Doc. No. 29 & Inc. Doc. No. 44, and memorandums in opposition to the motions to dismiss, LLC Doc. No. 41 & Inc. Doc. No. 64, on June 12 and June 26, 2023, to which Black Butte filed replies on June 28, 2023, LLC Doc. No. 51 & Inc. Doc. No. 73.   The Debtors filed motions to reject on June 12, 2023, LLC Doc. No. 28 & Inc. Doc. No. 43, and Black Butte filed responses in opposition on June 23, 2023, LLC Doc. No. 37 & Inc. Doc. No. 58.

[2]  Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

The Debtors own and operate a dairy and farm in central Idaho. They milk over 1,000 cows and farm around 2,400 acres of cow feed, including hay, corn, and barley. Ex. 352, p. 72:4-12. LLC is the land-holding company and owns the bulk of the real property used by Inc. Inc. is the operating entity and owns the other assets used in the dairy and farm, which it operates for the benefit of both entities. The Debtors' principals are brothers Doug and Mark Kerner.[3] The Kerners' grandfather started the dairy operation, which they took over after their parents retired. *Id.* at p. 70:10-17. The dairy operation employs approximately 30 people, many of whom live on the property. *Id.* at p. 117:19-118:1. Some of the real property used by Inc. is still owned by Bootjack Limited Partnership ("Limited Partnership"), an entity established by the Kerners' parents. The Kerners formed LLC to own the real property when they took over the operation from their parents.[4]

In 2022, the Debtors decided to sell the dairy operation and some of their farmland. The Kerners testified the reason for the sale was that the operation had been experiencing a few drought years.[5] *Id.* at p. 73:20-25, 80:4-6. This made it difficult to

---

[3] Doug and Mark Kerner were identified as the president and vice-president respectively of Inc. on its bankruptcy papers, with each holding a 50% ownership interest in the company. Ex. 306, p. 30. Doug and Mark Kerner were identified as the people in control of LLC on its bankruptcy papers, but their titles or membership interests were not specified. Ex. 301, p. 22.

[4] They believed they transferred the properties out of the Limited Partnership and into LLC, but a title report they obtained when negotiating with Black Butte showed the Limited Partnership still owned some of the real property. LLC Doc. No. 41 & Inc. Doc. No. 64, p. 9. Per the Debtors, the Limited Partnership did not file for bankruptcy "primarily because it was uncertain if the parents were still involved or not; Mark and Doug [Kerner] believed that only [Inc.] and [LLC] owned anything." *Id.*

[5] Specifically, Doug Kerner testified:

MEMORANDUM OF DECISION–3

grow sufficient feed and necessitated the purchase of more outside feed, which subtracted from the operation's bottom-line.  *Id.* at p. 80:7-81:20.  In July 2022, the Debtors and Limited Partnership entered into a purchase and sale agreement (the "Sale Agreement") with Magic Milk, Inc. "and/or assigns" to sell the bulk of their dairy operation while retaining just under 1,000 acres of farmland, which they intended to continue farming.[6] Exs. 332-336.  Magic Milk's president was Brent Funk.  Funk was a known dairyman in the area and the Kerners' understanding was that Magic Milk was going to continue the dairy operation.  Ex. 352, p. 117:11-18; Ex. 330, p. 130:13-19.  When the Sale Agreement was negotiated and executed neither the Kerners nor the Debtors had an attorney.  LLC Doc. No. 41 & Inc. Doc. No. 64, p. 9.  The original real estate agent the Debtors worked with became ill and they worked with a real estate agent with whom they did not have a prior relationship.  Ex. 352, p. 135:6-23.

The agreed upon purchase price was $19.8 million, comprised of $100,000 in earnest money and an $8.7 million downpayment to be paid in cash at the September 16, 2022 closing.[7]  Exs. 332 & 335.  The remaining $11 million was to be financed by the

---

Well, the drought years were pretty tough on us and we just – it was probably our third year in drought and  just had a pretty bleak aspect on how we were going to keep going as far as buying the feed and stuff and keep going forward.  The year before was just real bad.  We didn't hardly grow enough feed to do anything.

Ex. 352, p. 73:20-25.

[6] Ex. 352, p. 99:14-19.  The Sale Agreement lists the sellers as "Boot Jack Dairy LLC, Boot Jack Limited Partnership & [] any other affiliations to[.]"  Ex. 332.

[7] The earnest money was required to be paid within three days of acceptance of the Sale Agreement.  Ex. 332.  The earnest money became non-refundable upon the completion of the due diligence.  Ex. 335.

MEMORANDUM OF DECISION–4

Debtors, secured by a "mortgage," and repaid via "annual payments at 4% interest amortized over twelve (12) years." Ex. 335. The assets being acquired included about 1,671 acres of real property, water rights, 2,612 cows, the dairy and outbuildings, and an assignment of the entity's Dairy Farmers of America ("DFA") milk shipping rights and Confined Animal Feed Operation ("CAFO") permits. *Id.* The Sale Agreement contained rights of first refusal to buy "properties owned by Boot Jack Dairy, it's [sic] members or principals that are ancillary to its agricultural operation in Lincoln and Gooding Counties[]" and feed "produced on any farm ground owned by Boot Jack Dairy, and it's [sic] affiliates."[8] *Id.*

The Sale Agreement also had several other provisions relating to feed, specifically that the sale included "feed inventory on time of signing," that the parties would verify the feed inventory within the due diligence period, and that the included feed inventory would be "ample to carry dairy until 2023 crop is harvested." *Id.* The Sale Agreement further provided that the buyer was "responsible for the harvest of 2022 corn crop," and would pay $50 per ton "for all harvested corn with the exception of corn harvested from any farm pertaining to this agreement." *Id.*

---

[8] There was no stated expiration date for the rights of first refusal, nor specific terms on how they were to be exercised. Ex. 335. Mr. Darrington testified at the state court preliminary injunction hearing that a right of first refusal document never got drafted, though it was "contemplated" by the Sale Agreement. Ex. 330, p. 63:22-64:25.

MEMORANDUM OF DECISION–5

The Sale Agreement was memorialized by a "Re-23 Commercial/Investment Real Estate Purchase and Sale Agreement," "Addendum # 1," and "Counter Offer #1,"[9] each of which were executed by Doug Kerner on July 21, 2022.  Exs. 332-336.  Funk executed the first two documents on July 18, 2022 and the counteroffer on July 25, 2022.[10]  *Id.*

Shortly thereafter, Magic Milk assigned the Sale Agreement to Black Butte via an Assignment of Contract dated August 10, 2022.[11]  Ex. 342.  Black Butte was a recently formed entity owned by Karl Studer, a businessman and rancher with land near the Debtors.  Matthew Darrington, a local attorney in the area, was Black Butte's general counsel and general manager.  The assignment came as a surprise to the Kerners.  They did not know who Black Butte or Darrington were and did not learn of Mr. Studer's involvement until much later.

In early August 2022, the Debtors executed Addendum #2 to the Sale Agreement, which is not in the record.  Ex. 330, p. 28:24-29:16.  The buyer would not execute it because, per Mr. Darrington, it made the Sale Agreement more seller friendly by limiting the rights of first refusal and changing the amount of feed to be included in the sale.  *Id.* After the assignment, Black Butte and the Debtors executed several addendums, which

---

[9]  The counteroffer identified some real property that would not be included in the Sale Agreement, provided for reimbursement for hay and straw that the Debtors had committed to buying, and extended the time for the Debtors to remove equipment and personal property from the premises.  Ex. 336.

[10]  Magic Milk timely deposited the $100,000 earnest money with the title and escrow company as required by the Sale Agreement per a receipt of earnest money dated July 27, 2022.  Ex. 341.

[11]  Mr. Studer testified that Black Butte purchased the assignment from Magic Milk for $105,000.  Ex. 352, p. 138:23-139:5.

MEMORANDUM OF DECISION–6

mainly operated to extend the due diligence and closing deadlines.[12]  In mid-August

2022, Black Butte and the Debtors executed "Addendum # 3" to the Sale Agreement.  Ex.

337.  The addendum extended the approaching due diligence deadline to September 14,

2022 and the closing to October 14, 2022.  In mid-September 2022, Black Butte and

Debtors executed "Addendum #4" to the Sale Agreement which extended the due

diligence period another 30 days and acknowledged by reference to earlier parts of the

Sale Agreement that the corn from one of the properties being sold, referred to as the

Pantone property, was included in the sale.  Ex. 338.

    In September 2022, it came time for the Debtors to harvest their corn crops.  The

Kerners testified they had their real estate agent contact Black Butte's broker and real

estate agent about the harvest, but did not hear anything back from Black Butte regarding

the harvest of the corn on the Pantone property.  Ex. 352, p. 91:3-14, 130:23-131:12.  The

Debtors assert that Black Butte was obligated to harvest the 2022 corn crop on the land it

was purchasing under the Sale Agreement.  Mr. Darrington testified his interpretation of

the buyer being "responsible for 2022 corn harvest" was that Black Butte only had to

physically harvest the corn if the deal closed before harvest-time and otherwise only had

to reimburse the Debtors for their harvest expenses.  *Id.* at p. 54:21-56:15.  Moreover, he

---

[12]  The Sale Agreement gave the buyer the option to extend the due diligence and closing by 30 days.  Ex.
335.

MEMORANDUM OF DECISION–7

testified that no one from the Debtors made a demand on anyone at Black Butte in September 2022 that it physically harvest the corn.[13]  Ex. 330, p. 22:24-25:3.

In early October, the Debtors invoiced Black Butte for their harvest expenses on the Pantone property and for the corn they harvested on their other properties.  The invoiced amount was approximately $379,000.  Ex. 331, p. 14:9-12.  The Debtors testified they never really got a response from Black Butte on the invoices.  Ex. 352, p. 93:25-94:5.  Black Butte apparently was confused by the invoices and wanted more documentation concerning the volume of corn harvested and a breakdown of the expenses of the harvest before it would pay it.  *Id.* at p. 55:23-56:3.

On October 7, 2022, Black Butte and the Debtors executed "Addendum # 5" to the Sale Agreement which extended the closing deadline to November 14, 2022.  Ex. 339. On October 12, 2022, Mr. Darrington communicated to Black Butte's broker and real estate agent that he had reviewed the feed inventory that the Debtors' real estate agent had sent to Black Butte's broker and real estate agent via email on August 27, 2022 and agreed to accept it, citing language in the Sale Agreement stating that "Seller and Buyer will verify inventory of cattle, feed, and dairy supplies."  Ex. 344 & Ex. 330, p. 37:1-10. The feed inventory was "as of August 1, 2022" and part of a multi-page document, which included a burn-rate for feed being consumed.[14]  The Debtors assert this was not the

---

[13]  This testimony was from the state court preliminary injunction hearing.

[14]  The document in the record is undated and unsigned, though the exhibit list description states it is dated July 12, 2022.  Ex. 344, p. 2-4;  LLC Doc. No. 58 & Inc. Doc. No. 81.  Darrington testified at the state court preliminary injunction hearing that the email, which was introduced into the state court record, was from August 27, 2022.  The document also included a list of: "Feed purchases not paid for," "Feed

correct feed inventory; while they did provide this document to their real estate agent, they contend it did not reflect the feed inventory accurately and/or the inventory to be included in the sale.[15]  Ex. 330, p. 116:20-118:9.  Around this time, Black Butte was trying to get the Debtors to assign their DFA milk shipping rights to Whitesides Dairy, to whom Black Butte had contracted to sell the DFA rights shortly after the closing the closing of this transaction.  Ex. 352, p. 47:5-48:8.

After the assignment of the Sale Agreement to Black Butte and during the extended due diligence period, the Kerners started to become "suspicious and dubious" about Black Butte and the Sale Agreement.  LLC Doc. No. 83 & Inc. Doc. No. 105, p. 2. Mark Kerner testified the corn harvest "was a huge part," and when Black Butte did not show up "it made [him] sick."  Ex. 352, p 116:3-4.  Mark Kerner indicated the Kerners never knew who Black Butte was, and that none of the principals from Black Butte ever came to the dairy to learn how it was operated, or to introduce themselves to the employees to "say this is what's going to happen."  *Id.* at p. 116:5-10.  He asserted that Black Butte's real estate agent only came to the property twice, once in September and once in December of 2022.  Ex. 352, p. 120:8-22.  He said he thought at various points

---

Owned not harvested," "Baled Hay," "Corn Silage," "Baled Triticale," "Triticale," and "Haylage."  Mr. Darrington testified it also contained "a survey and some legal descriptions. … But the most important part of this was pages 11, 12 and 13, which was when [the Debtors' real estate agent] had disclosed that feed inventory to us."  Ex. 330, p. 37:1-10.

[15]  This testimony was from the preliminary injunction hearing in the state court action.  The Debtors' position appears to be that they only needed to provide enough feed to stock the dairy until the 2023 crop was harvested and the other inventory would be available for Black Butte to purchase.  LLC Doc. No. 83 & Inc. Doc. No. 105, p. 9; Ex. 330, p. 115:8-116:19. 141:3-8.  It is unclear approximately how much feed Black Butte asserts was to be included under the Sale Agreement.  Its position seems to be that all the Debtors' feed was to be included, with certain exceptions.  Ex. 324, p. 6 & 9.

MEMORANDUM OF DECISION–9

that the deal was off and Black Butte had abandoned it.  *Id.* at p. 121:14-19, 134:17-23.
Black Butte did not dispute its principals were not in direct communication with the
Debtors, but asserted its real estate agent and broker were in communication with the
Debtors' real estate agent.  *Id.* at p. 26:17-18, 143:21-144:6.

Mark Kerner testified the Debtors felt compelled to hire a lawyer, noting he
usually makes deals eye-to-eye and over a handshake and "this was nothing like that at
all."  *Id.* at p. 121:1-7.  He noted the Debtors were "in a position where we had to do
something.  This is way over our heads."  *Id.*  The Debtors ultimately hired Steven
Peterson, a Twin Falls attorney.

Mr. Darrington testified the Debtors just needed to send over "numbers" to the
title company for settlement statements for the closing to occur.  *Id.* at p. 33:25-34:5.  Mr.
Darrington testified he reached out to Mr. Peterson to ask for a status update and did not
hear anything back.  Ex. 330, p. 39:18-40:10.

On October 31, 2022, Mr. Peterson emailed Mr. Darrington a letter regarding the
transaction.  Ex. 343.  In the letter, Mr. Peterson advised the Debtors were still willing to
close, but they felt they had been misled from the beginning about the particulars of the
transaction and were concerned with Black Butte as the new purchaser.  *Id.*  Mr. Peterson
opined he thought Black Butte was an intermediary for another buyer, Whitesides Dairy,
because of Black Butte's request that the DFA milk shipping rights be assigned to

MEMORANDUM OF DECISION–10

Whitesides.[16] *Id.* Mr. Peterson advised the Debtors would not start the transfer proceedings with Whitesides until they were sure this transaction would close. *Id.* The letter further indicated the Debtors were concerned they would not be properly compensated for the harvested feed they placed on the dairy, the fall work they did, and the expenses they continued to incur. *Id.* Mr. Peterson proposed that the real estate agents help negotiate a fair price for the feed and fall work, and once the price was agreed on, it could be placed in escrow with the title company and paid at closing. *Id.*

Mr. Peterson communicated that because of the "delay and uncertainty," the Debtors wanted the downpayment increased to $10.5 million, a personal guarantee for the remainder, and advised that the Debtors would no longer accept a right of first refusal on their feed or farmland for any buyer. *Id.* Mr. Peterson indicated he advised the Debtors that the buyer could sue for specific performance or back out of the deal, and the Debtors would be "more than willing to accept either option." *Id.*

Black Butte rebuffed these proposed changes. An effort was made to extend the closing into December 2022 to give the parties time to resolve their differences, but ultimately the Sale Agreement did not close.[17,18] At some point in time, the Debtors

---

[16] In the letter, Mr. Peterson incorrectly referred to Whitesides Dairy as "Whitesickles." Ex. 343, p. 1.

[17] At the preliminary injunction hearing in the state court action, Mr. Darrington testified he emailed Mr. Peterson on November 9, 2022 for a status update, and Mr. Peterson responded that the Kerners would not extend the closing and as far as they were concerned the deal was off. Ex. 330, p. 55.

[18] At the preliminary injunction hearing in the state court action, Mr. Studer testified he met with the Kerners in December 2022 at a country store and they wanted to sell, but "were not interested in selling

learned that Black Butte intended to convert the dairy operation into a feedlot and sell the dairy cattle. Ex. 352, p. 45:22-46:1, 118:2-5. This bothered the Kerners because feedlots require far fewer employees and they were concerned many of their workers would not be retained. *Id.* at p. 86:22-87:10, 118:6-16.

On January 9, 2023, Black Butte sued the Debtors and the Limited Partnership in Idaho state court for breach of contract seeking specific performance or alternatively damages.[19] Ex. 320. In its complaint, Black Butte alleged it was ready, willing, and able to close on the Sale Agreement, but before the closing date the defendants "anticipatorily breached the [Sale Agreement] by declaring the deal dead, and failed to participate in the closing pursuant to the terms of the [Sale Agreement]." *Id.* ¶¶ 17-18.

In February 2023, the parties' respective state court counsel, Mr. Trout for Black Butte and Mr. Edson for the Debtors, exchanged offers to settle the matter.[20] Mr. Edson advised if the parties could not reach an agreement or if litigation continued, the Debtors

---

per the contract at that time in the way that the contract was written ... and wanted to offer different solutions." Ex. 330, p. 85:12-23, 87:7-22.

[19] Black Butte estimated its damages claim would exceed $10 million. Ex 320 ¶ 27. In the Debtors' memorandum in opposition to Black Butte's motion to dismiss, they suggested "there are more than enough assets just in the surplus feedstocks to pay any damages claim which Black Butte may be awarded." LLC Doc. No. 41 & Inc. Doc. No. 64, p. 3.

[20] Mr. Trout's letters were identified as exhibits by the Debtors but not offered for admission, Exs. 106 & 107, while the exhibit containing Mr. Edson's letters was admitted by stipulation. Ex. 324, p. 5-9. The Debtors proposed to settle the matter for an increased purchase price ($20.8 million), an increased down payment ($10 million), changes to the terms of the seller financing (6% interest paid over ten years in monthly installments and personally guaranteed by two principals of Black Butte), a set amount of feed (that is, enough to feed the herd through the 2023 harvest, which was identified as 3,000 bales of hay, 6,000 tons of corn, and 3,000 tons of triticale), and the expiration of the rights of first refusal one year from the date of closing. *Id.* at p. 8 & 9. The Debtors argued Black Butte would only settle the matter for a reduced purchase price and $250,000 in attorney's fees. LLC Doc. No. 41 & Inc. Doc. No. 64, p. 10.

MEMORANDUM OF DECISION–12

would file for and complete a sale through bankruptcy.  Ex. 324, p. 8-9.  He advised the Debtors would reject the Sale Agreement with Black Butte, eliminating its right to purchase and rights of first refusal.  *Id.*

Around this time, Mr. Studer called the Kerners directly to make a $26 million offer that included the approximately 1,000 acres the Debtors had retained under the Sale Agreement.  Ex. 330, p. 93:21-94:1.  Based on Mr. Edson's response to Black Butte, the Debtors did not view this as a fair price for the land.  Ex. 324, p. 5.

On February 21, 2023, the Debtors answered the complaint contesting the validity and enforceability of the Sale Agreement.  Ex. 322.  The Debtors asserted Black Butte did not comply with certain provisions of the Sale Agreement, such as harvesting the 2022 corn crop and reimbursing the Debtors for feed and other expenses.  *Id.*  The Debtors also asserted that material terms of the Sale Agreement were vague and ambiguous, and that Black Butte did not exercise good faith and fair dealing.  *Id.*

On February 23, 2023, Black Butte moved for a temporary restraining order.  The state court imposed the TRO on an ex parte basis on February 28, 2023, restricting the Debtors from selling any of the real or personal property subject to the Sale Agreement. Ex. 328.  The order provided it would not apply to "actions taken by [the Debtors] in the ordinary course of the dairy operations."  *Id*.  That order expired on March 3, 2023

because Black Butte did not deposit a $10,000 bond with the state court.[21]  Ex. 330, p. 5:5-11.

On April 27, 2023, the state court held an evidentiary hearing on whether to impose a preliminary injunction under Idaho Rule of Civil Procedure 65(e)(3), which provides such an injunction may be granted "when it appears during the litigation that the defendant is doing, threatening, procuring or allowing to be done, or is about to do, some act in violation of the plaintiff's rights, respecting the subject of the action, and the action may make the requested judgment ineffectual[.]"  Ex. 330.  The Kerners, Studer, and Darrington testified at the hearing.  On May 12, 2023, the state court issued an oral decision, finding a preliminary injunction should be imposed.  Ex. 331.  The state court judge made preliminary findings that:

> The present record in this case does not establish any doubt that there should have been a closing.  We had a closing set up.  We had approval of the feed.  We had payment of earnest money.  The buyer's ready, willing, and able.  And there was a dispute about feed.  It's a fairly narrow issue. The buyer does state they would want to true up accounts and would pay for the extra feed.

Ex. 331, p. 19:25-20:7.

The exact terms of the injunction were not clearly stated on the record, though the state court identified that Black Butte asked for the "status quo" to be maintained so that it could receive the full benefit of its specific performance request.  *Id.* at p. 6:23-7:1.  On

---

[21]  Black Butte's counsel, Mr. Trout, asserted he did not receive notice of the order entering the TRO and thus did not timely deposit the requisite funds.  Ex. 330, p. 5:5-11.

MEMORANDUM OF DECISION–14

May 16, 2023, the state court entered an order imposing a preliminary injunction against the Debtors for the reasons it articulated on the record.[22]  Ex. 329.

*B) Bankruptcy and post-petition events*

On May 18, 2023, Inc. and LLC filed chapter 12 bankruptcy petitions.  Exs. 300 & 306.  The Debtors moved to administratively consolidate the cases, but due to an uncorrected service deficiency the Court has not yet done so.  Exs. 302 & 309.

On its schedules, Inc. disclosed assets of $5,013,673.51 against liabilities of $3,645,735.  Ex. 306.  Inc.'s assets included $315,909 in its line of credit checking accounts, membership shares in DFA valued at $490,875.61,[23] $2,260,600 worth of livestock, $1,608,500 worth of farm equipment, and feed inventory valued at $0.00.  *Id.* On its schedules, LLC disclosed assets of $26,347,800 against liabilities of $4,060,000.  Ex. 300.  LLC's only asset is 2,135.7 acres of real property.  *Id.*

Inc. and LLC's only secured creditor is AgWest Farm Credit ("AgWest").  Exs. 300 & 306.   Inc. scheduled AgWest with a $3,600,000 claim secured by most of Inc.'s assets, including its milk sales.  Per a stipulated cash collateral motion, Inc. clarified it owes AgWest $3,771,942.44 as of May 25, 2023.  Ex. 310, p. 5.  LLC scheduled AgWest as having a $4,013,000 claim secured by the real property.  Per a stipulated cash

---

[22]  The state court required a $10,000 bond, in addition to the $100,000 earnest money already being held in escrow, which Black Butte deposited.  Ex. 331, p. 20:13-16.

[23]  It is unclear if this is the value of the DFA milk shipping rights, the Debtors' patronage account with the DFA, or both.  At the hearing, Mr. Darrington explained the patronage account is a retirement type account consisting of money retained by DFA for operations from milk sales that it pays back via distributions to its members over time.  Ex. 352, p. 48:11-20.

MEMORANDUM OF DECISION–15

collateral motion, the total owed to AgWest is $4,077,569.30 as of May 19, 2023. Ex. 345, p. 10. Inc. and LLC are co-makers and co-debtors on their loans from AgWest, which range from shorter term operating lines of credit to longer-term loans used for the acquisition of real property.[24] Ex. 311, p. 7 & Ex 345, p. 9. Inc. and LLC were current on their obligations to AgWest as of the filing date.[25] Ex. 345 at p. 8.

On its schedules, Inc. identified its only unsecured creditors as Black Butte, with a "potential claim for rejection of contract" in an unknown amount and its state court attorney, Gery Edson, with a $45,735 claim for attorney fees. Ex. 306. As with Inc., LLC listed Black Butte and Mr. Edson as its sole unsecured creditors, the only difference being that Mr. Edson is listed as having a slightly higher claim for attorney's fees.[26] Ex. 300.

On June 8, 2023, the Debtors removed the state court action so this Court could determine the rights of the parties, the enforceability of the Sale Agreement, and the amount of any claim of Black Butte. Ex. 312. Black Butte moved to remand. Adv. Case

---

[24] The Limited Partnership and various members of the Kerner family are also co-makers and co-debtors on these loans. Exs. 311 & 345.

[25] The stipulation for LLC's use of cash collateral states that "[s]ubsequent to the bankruptcy filing the payments due in June [2023] under the Loans were not made." Ex. 345, p. 8. AgWest deducts what it is owed by the Debtors from the milk check, so the Court presumes, in an abundance of caution, AgWest did not deduct this payment due to the Debtors' bankruptcy, and not because there were insufficient funds. Further, Inc.'s final budget reflects a doubled July 2023 rent payment to LLC to account for this missed payment. Ex. 345, p. 21.

[26] Mr. Edson did not file proofs of claim in either bankruptcy. It is unclear if Mr. Edson has separate claims of around $45,000 against Inc. and LLC, or if he has one claim of approximately $45,000 for which the Debtors are jointly liable.

MEMORANDUM OF DECISION–16

No. 23-08014-JMM, Doc. No. 3.  On June 9, 2023, Black Butte filed its motions to dismiss the Debtors' bankruptcies as bad faith filings.  Exs. 303 & 313.

That same date, Black Butte filed an emergency motion requesting that the Debtors be barred from selling feed to outside parties until the Court hears its motions to dismiss.  LLC Doc. No. 23 & Inc. Doc. No. 38.  Black Butte alleged that the Debtors were seeking to diminish the feed inventory by selling to third parties in violation of the state court's preliminary injunction.  *Id.*  The Debtors asserted they were merely selling surplus, non-dairy quality feed to fund operations (including buying necessary supplies for their herd) and that selling the feed is part of its ordinary operations.  LLC Doc. No. 30 & Inc. Doc. No. 45.  The Debtors also asserted the preliminary injunction was void because it did not comply with Idaho Rule of Civil Procedure 65(d).  *Id.*  This rule requires that every order granting an injunction must state its terms specifically, describe in detail the acts restrained, and state why it was issued.  The Court interpreted Black Butte's motion as a request for adequate protection and granted it an adequate protection lien in the feed being sold to the extent Black Butte proves it has an interest in the feed under the Sale Agreement.  LLC Doc. No. 36 & Inc. Doc. No. 56.

On June 12, 2023, the Debtors moved to reject their Sale Agreement with Black Butte pursuant to § 365.  Exs. 304 & 314.  On June 21, 2023, Inc. filed amended schedules to add 11 unsecured creditors "whose payments prepetition did not clear and

are thus still owing." [27]  Ex. 317.  The creditors' claims, which presumably arose from the recent operating expenses of the dairy, ranged from $33.62 to $37,312.19 and totaled just under $94,000.  *Id.*  It is unclear why these payments did not clear, as Inc.'s schedules identified it as having over $300,000 in its line of credit checking accounts.  On its amended schedules, Inc. also changed the value of its feed inventory from $0 to $1,582,740[28] and added about 1,900 acres of growing crops with an unknown value.[29] *Id.* at p. 4.  Factoring in the amended schedules, Inc.'s assets total $6,596,413.51 (plus whatever value the growing crops yield) and Inc.'s total liabilities are $ 3,911,465.78 (plus whatever claim Black Butte may have against it).

---

[27] These claims are: Anderson Hoof Trimming, Inc. with a claim of $1,477 for "Hoof trimming for dairy herd;" Darling Ingredients with a claim of $305 for "Feed supplements;" First Call Dairy Service with a claim of $2,764.91 for "Parts and supplies; service;" John Deere Financial with a claim of $1,886.73 for "Parts;" Kimball Midwest with a claim of $229.90 for "Parts and fasteners;" Magic Valley Dairy Systems with a claim of $2,497.13 for "Dairy equipment and repairs;" Productivity Plus-CNH with a claim of $33.62 for "CNH parts;" Scoular with a claim of $35,222.28 for "Feed and grain;" Simplot Western Stockmen's with a claim of $37,312.19 for "Supplies, feed supplements;" Specialty Sales with a claim of $5,086.28 for "Dairy bath chemicals and supplies;" and United Oil with a claim of $6,973.30 for "Fuel." These claims total $93,788.34.  Of these listed creditors, three filed proofs of claim: Anderson Hoof Trimming, Scoular, and Simplot Western Stockmen's.  Anderson Hoof Trimming filed a proof of claim in the amount of $3,242, Scoular filed a proof of claim in the amount of $107,097.52, and Simplot Western Stockmen's filed a proof of claim in the amount of $39,819.87.  Four other proofs of claim were filed in the Inc. bankruptcy: Black Butte, AgWest, the Idaho State Tax Commission with a $20.08 claim, and Verizon Wireless with a $1,005.31 claim.  In LLC's bankruptcy, three proofs of claim were filed: AgWest, Black Butte, and Simplot Western Stockmen's, which filed the same claim as in the Inc. bankruptcy.

[28] Inc. valued this feed at $2,540,170 on its stipulation for use of cash collateral, Ex. 310, and amended stipulation for cash collateral, Ex. 311.  On Inc.'s amended schedules, the broken-out components of the feed inventory actually add up to $2,232,730.  Ex. 317.  It is unclear where the $1,582,740 figure came from, though Inc. did indicate that "some" of the feed "has been fed" on its schedules.  *Id.*

[29] Doug Kerner explained they did not provide a value for the growing crops, in essence, because the value of the crops is determined at the time of harvest and things can happen to the crops between now and then to diminish their value, such as hail or frost.  Ex. 352, p. 106:9-17, 110:17-22, 112:4-11.

At the June 30 and July 20 hearings, evidence was offered concerning the Debtors'
financial health, why they filed for bankruptcy, and their need for any kind of
reorganization.  Inc. makes most of its revenue through the sale of milk, which it
supplements with the sale of feed and livestock.  *See, e.g.,* Ex. 345, p. 21.  It also
accounts for rent to LLC and the Limited Partnership so they can pay their loan
obligations to AgWest, taxes, and other expenses.  AgWest was assigned Inc.'s milk sale
checks, from which it deducts loan payments owed by Inc., LLC, and the Limited
Partnership and returns the balance to Inc.  The cash flow of the dairy operation
fluctuates over the course of the year.  It is lower in winter and spring when there are
increased operating costs and higher in the summer and fall when they can sell and feed
from crops.  LLC Doc. No. 27 & Inc. Doc. No. 42, p. 4.  Annual earnings vary depending
on the Debtors' feed crop production and the price of milk, fuel, and labor.

The Kerners testified they considered filing for bankruptcy as early as January
2023 and if they knew of the potential benefits of chapter 12, the Debtors would have
filed earlier.  Ex. 352, p. 109:18-25, 119:9-13.  Similar to their reasoning for selling the
dairy operation, the Kerners testified that it was probably their third year with low water
and they were not making lots of money.  *Id.* at p. 118: 20-23.  Notwithstanding, Doug
Kerner acknowledged that the Debtors' water situation is looking "real good" this year
and they would have sufficient water to grow feed.  *Id.* at p. 79:20-23.  He learned of the
favorable water situation around March or April of 2023.  *Id.* at p. 110:1-3.  Mark Kerner
testified he was always concerned about the finances of the Debtors, the Debtors were

MEMORANDUM OF DECISION–19

never "rolling in money," and in the dairy industry, if you do things the honest way you will never be "rolling in money." *Id.* at p. 118:17-119:4.

Mr. Darrington testified that the due diligence documentation[30] provided by the Debtors in the lead up to the closing of the Sale Agreement, Ex. 340, showed "it was an extremely healthy operation," noting there were cash reserves, the cows appeared to be in good health and were milking well, and they were selling the milk for a good price. Ex. 352, p. 30:18-25. He also noted there was a lot of feedstock that Black Butte could purchase and that the Debtors appeared to have a significant line of credit from AgWest that they could tap into. *Id.* at p. 30:21-22, 31:1-21.

The Kerners explained they thought the chapter 12 process would help the Debtors become better operators and would let them continue operating. *Id.* at p. 96:3-8, 101:1-7, 110:7-8. The Kerners were unclear if the Debtors were going to restructure any debt with AgWest, though Mark Kerner testified the Debtors' intent is to file a plan to work out their debt and they must restructure their operation. *Id.* at p. 101:8-18, 119:16-21. The Kerners did not identify rejecting the Sale Agreement with Black Butte as a reason for the Debtors' bankruptcies, though Mark Kerner stated the Debtors wanted to reject the Sale Agreement because he does not have faith in the buyer. *Id.* at p. 126:14-20. He asserted Black Butte breached, did not perform at all, and he does not want to provide

---

[30] One of these documents was an "Earnings Trend" which appeared to contain consolidated financials for Inc. and LLC. It showed Inc. had net profits of -$10,296 in 2018, $275,809 in 2019, $1,656,865 in 2020, and -$63,453 in 2021. It is unclear why the 2021 net profit on this document is -$63,453, while it is $242,067 on the consolidated financial sheet prepared by AgWest at Ex. 350, p. 185.

MEMORANDUM OF DECISION–20

$11 million in financing to a party that cannot even harvest corn.  *Id.*  Nor do the Debtors want their land and future feed to be tied up with Black Butte by the rights of first refusal if the Sale Agreement is ultimately enforceable.  The Kerners acknowledged that Black Butte may have a claim if the Sale Agreement is rejected and the Debtors would be committed to paying that claim through their plans.  *Id.* at p. 119:22-120:5.

The Debtors also explained that if the sale to Black Butte was enforced, the down payment would not cover all their debt to AgWest after accounting for taxes and closing costs.  *Id.* at p. 123:15-19.  The Debtors' accountant, Ms. Wagner, prepared a worksheet in June 2022 based on an assumed $8 million downpayment.  Ex. 112-A.  The worksheet shows that the Debtors would have about $270,000 remaining after estimated taxes and closing costs, assuming they paid off $6,145,649 of their debt to AgWest.  *Id.*  The Debtors identified the down payment would not be enough to continue a farming operation after the sale, Ex. 352, p. 123:24-25, and that they could end up having to bring money to a closing based on the post-closing "true-up" provision cited by Black Butte in the Sale Agreement.

Inc.'s 2021 and 2022 tax returns show business losses of close to $1.5 million and $1,168,881 million respectively.  Exs. 109 & 110.  However, the losses include deductions for rent totaling $542,708 and $551,410 for the 2021 and 2022 tax years, most

of which was paid to LLC[31] (and some to the Limited Partnership).  *Id.*  In addition, the

losses do not account for $365,397 and $549,498 in livestock sales and $290,364 and

$234,782 in depreciation in these tax years.  *Id.*[32]  A consolidated financial statement

generated by AgWest which eliminates inter-entity transactions between Inc., LLC, and

the Limited Partnership, shows that the entities had a net profit of $242,067 in 2021

despite the $1.5 million loss on Inc.'s tax return.  Ex. 350, p. 185.  Removing the Limited

Partnership from the consolidated financial statement does not change the Debtors'

overall profit by much.  AgWest did not prepare a consolidated financial statement for

2022, though a representative of AgWest testified that AgWest was not aware of any

indication of financial distress of the Debtors as of the petition date.  *Id.* at p. 23:3-5.

Inc.'s final proposed budget, which accounts for rent payments to LLC and the Limited

Partnership, projects a $560,932 "carryover" from May 28, 2023 to the end of February

2024.[33]  The Debtors assert that proceeding with litigation in state court would increase

their operating costs because the preliminary injunction would deprive the Debtors of the

---

[31] LLC's 2021 tax return shows rental income of $517,208 against interest and tax expenses for net income of $246,848.  Ex. 109-A.  LLC's 2022 tax return shows rental income of $517,596, against interest and tax expenses for net income of $226,165.  Ex. 110-A.

[32] The tax loss is also impacted by deductions for feed totaling $2,405,509 in 2021 and $3,209,060 in 2022.  Exs. 109 & 110.  Black Butte suggests because Inc. grows much of the feed this expense item is "nothing more than an accounting ploy to avoid tax."  LLC Doc. No. 82 & Inc. Doc. No. 104, p. 8.  The Court is unclear how much of the deduction is comprised of purchased feed versus expensed feed, if any, that the Debtors grew.  The Debtors' earnings consolidation report reflects they purchased $1,549,284 worth of feed in 2021, which is about $850,000 less than Inc.'s deduction.  Ex. 350, p. 185.

[33] Inc.'s first filed budget projected a "carryover," of $1,710,703 for 2023.  Ex. 307.  Inc.'s next two filed budgets projected "carryovers" of $990,591 and $742,744 for the period of March 1, 2023 to the end of February 2024.  Exs. 310 & 311.  LLC did not file a budget because, per Debtors, LLC historically has not maintained a bank account and does not have a bank account at present.  Ex. 345, p. 11.

ability to sell surplus feed to raise the operating cash to care for and maintain their cows. Doug Kerner testified the Debtors need the money from the sale of surplus crop to operate "[b]ecause we don't have any money.  Milk price is way down.  You know, all the costs are up.  Diesel, hired help, all that stuff." Ex. 352, p. 83:22-84:3.  If they could not sell surplus feed, he said the Debtors would have to borrow money from the bank. *Id*. at p. 84:8-14.  Black Butte pointed out that the Debtors have a sizable line of credit with AgWest they could borrow against while the state court litigation is resolved or modify their injunction if they require funds to properly care for their dairy herd.

*C) Arguments of the Parties*

Black Butte argues several indicia of bad faith are present in the Debtors' bankruptcies.  First, it argues the Debtors have no need for a reorganization since they are balance sheet and cash-flow solvent, have significant equity, a healthy operation, and no substantial financial pressure.  Black Butte highlights that Inc. and LLC only have one secured creditor, AgWest, with whom they are current on their payments and that it and the Debtors' state court attorney are essentially the Debtors' only unsecured creditors. Black Butte identified that the Debtors had sufficient cash on hand to pay-off the unsecured creditors that Inc. listed on its amended schedules.  Furthermore, it argues that Debtors filed their bankruptcies as a litigation tactic and/or to forum shop to reject the Sale Agreement and avoid Black Butte's preferred remedy of specific performance. Relatedly, Black Butte asserts this is two-party dispute capable of prompt resolution in the state court.  It also asserts the timing of the Debtors' filings, shortly after the entry of

the preliminary injunction, reflects a lack of good faith.  Last, Black Butte contends that the Debtors have seller's remorse, want more money or different terms,[34] and are using bankruptcy to impermissibly achieve that result.

The Debtors oppose dismissal, asserting they filed in good faith so their dairy operation could continue, that they have been in financial straits for some time as evidenced by their operating losses and the Kerners' testimony, and because the preliminary injunction entered by the state court could adversely impact their business by preventing them from selling surplus feed to fund operations.[35]  The Debtors note it is essential that they be allowed to operate properly and this litigation is sufficient grounds to file for bankruptcy.  LLC Doc. No. 41 & Inc. Doc. No. 64, p. 10.  The Debtors assert it allows them to "formulate a plan, pay their claims (including Black Butte's if it actually has any), work with their main lender and properly feed and care for their herd."  *Id.* They assert this is what chapter 12 bankruptcy is all about.  Exs. 305 & 315, p. 3.

In support of their motions to reject, the Debtors argue the Sale Agreement is executory and they have valid business reasons to reject it, such as resolving what could be prolonged and expensive litigation, and extricating themselves from Black Butte, who

---

[34]  Black Butte used more colorful terminology, such as the Debtors are trying to get a "flush" start, rather than a fresh start, and that "greed" is motivating their bankruptcies.  The Court is not convinced that is the case.

[35]  In Debtors' memorandum in opposition to dismissal they explained their bankruptcies are "based on Black Butte's lack of performance, the state court decision that would have precluded them from caring for their dairy herd immediately for the pittance of a $10,000 bond, and the economic factors that required Debtors to file for bankruptcy relief."  LLC Doc. No. 41 & Inc. Doc. No. 64.

they feel is trying to force them into a bad deal.  Exs. 304 & 314.[36]  The Debtors assert

their rejection of the Sale Agreement would "eliminate any complaints about the contract,

the 'fault' of either party, and virtually all of Black Butte's motions and objections."  *Id.*

at p. 3.

In retort, Black Butte asserts the Sale Agreement is not executory because it was

ready, willing, and able to close, and the Debtors would not let them perform.

Alternatively, if the Sale Agreement is found to be executory, Black Butte argues that the

Debtors should not be allowed to reject it because they filed their bankruptcies in bad

faith.

## Analysis and Disposition

The Court will first address Black Butte's dismissal motions, because if dismissal

is proper, the issue of contract-rejection and executoriness will be moot.

*A) Legal standard*

As with chapter 11 and 13 bankruptcy petitions, chapter 12 bankruptcies may be

dismissed for "cause."  *See* §§ 1112(b), 1307(c), and 1208(c).  Though not specifically

listed, "cause" for dismissal includes a petition not filed in good faith.  *In re Cabral*, No.

12-12050-A-12, 2012 WL 8441317, at *4 (Bankr. E.D. Cal. Oct. 10, 2012).  The party

seeking dismissal bears the burden of establishing a debtor's lack of good faith by a

preponderance of the evidence.  *Baroni v. Seror (In re Baroni)*, 36 F.4th 958, 966 (9th

---

[36]  As to this point, the Court notes that rejection could moot Black Butte's specific performance request,
but litigation concerning the validity, enforceability, and damages from the breach of the Sales Agreement
likely would continue.

Cir. 2022) (stated in the context of a chapter 11 conversion or dismissal); *Sullivan v. Harnisch (In re Sullivan)*, 522 B.R. 604, 614 (9th Cir. BAP 2014) (same).

"The question of a debtor's good faith 'depends on an amalgam of factors and not upon a specific fact.'" *Marshall v. Marshall (In re Marshall)*, 721 F.3d 1032, 1048 (9th Cir. 2013) (quoting *Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828 (9th Cir. 1994)). "[T]he courts may consider any factors which evidence 'an intent to abuse the judicial process and the purposes of the reorganization provisions.'" *Id.* (quoting *Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va. (In re Phoenix Piccadilly, Ltd.*), 849 F.2d 1393, 1394 (11th Cir. 1988)). Stated differently, "[t]he test is whether a debtor is attempting to unreasonably deter and harass creditors or attempting to effect a speedy, efficient reorganization on a feasible basis." *Marsch*, 36 F.3d at 828 (citation omitted).

In chapter 12 cases, courts have considered factors relevant to bad faith filings in chapter 13 cases, chapter 11 cases, or both. *See, e.g., In re Olson*, 609 B.R. 339, 348-49 (Bankr. D. Mont. 2019) (applying factors articulated in chapter 11 and 13 cases); *In re Borg*, 105 B.R. 56, 57 (Bankr. D. Mont. 1989) (applying factors articulated in chapter 11 cases); *In re Powell*, No. 4:22-00953-MJC, 2022 WL 10189109, at *3-4 (Bankr. M.D. Pa. Oct. 14, 2022) (applying factors articulated in chapter 13 cases); *In re Anderson*, 631 B.R. 417, 421 (Bankr. S.D. Ohio 2021) (same). In the chapter 13 context, recognized factors include:

> (1) whether the debtor misrepresented facts in [its] [] petition or plan, unfairly manipulated the Bankruptcy Code, or otherwise filed [its] petition or plan in an inequitable manner;

MEMORANDUM OF DECISION–26

(2) the debtor's history of filings and dismissals;
(3) whether the debtor only intended to defeat state court litigation; and
(4) whether egregious behavior is present.

*Drummond v. Welsh (In re Welsh)*, 711 F.3d 1120, 1129 (9th Cir. 2013) (citing *Leavitt v. Soto (In re Leavitt)*, 171 F.3d 1219, 1224 (9th Cir. 1999)). In chapter 11 cases, recognized factors include whether:

(1) the debtor has only one asset;
(2) the debtor has an ongoing business to reorganize;
(3) there are any unsecured creditors;
(4) the debtor has any cash flow or sources of income to sustain a plan of reorganization or to make adequate protection payments; and
(5) the case is essentially a two-party dispute capable of prompt adjudication in state court.

*Windscheffel v. Montebello Unified Sch. Dist. (In re Windscheffel)*, No. CC-16-1303-FLKu, 2017 WL 1371294, at *4 (9th Cir. BAP Apr. 3, 2017) (citing *St. Paul Self Storage Ltd. P'ship v. Port Auth. (In re St. Paul Self Storage Ltd. P'ship)*, 185 B.R. 580, 582-83 (9th Cir. BAP 1995)).[37] At bottom, however, "[a] finding of bad faith is made on a case-by-case basis; there is no list of factors which must be present in each case to make the finding, and the weight given to any factor depends on the circumstances of the individual case." *Legal Serv. Bureau, Inc. v. Orange Cty. Bail Bonds, Inc. (In re Orange Cty. Bail Bonds, Inc.)*, 638 B.R. 137, 149 (9th Cir. BAP 2022).[38]

---

[37] This is the factor test identified by Black Butte in its motions to dismiss, though it misattributes the test to the Ninth Circuit BAP's *In re Stolrow's* decision. 84 B.R. 167 (9th Cir. BAP 1988).

[38] *See also Mahmood v. Khatib (In re Mahmood)*, No. 2:15-BK-25281-DS, 2017 WL 1032569, at *4 (9th Cir. BAP Mar. 17, 2017) ("The bankruptcy court did not have to consider all the factors; nor did it have to weigh them equally. A bankruptcy court may find one factor dispositive. Indeed, a bankruptcy court may find bad faith even if none of the factors are present.").

MEMORANDUM OF DECISION–27

*B) Analysis*

As an initial matter, several of the recognized factors identified above are not present or are irrelevant to the Debtors' bankruptcies. For instance, these are the Debtors' first and only bankruptcies, the Debtors as a combined operation have many assets, the Debtors have an ongoing business which could be reorganized, and they project to have ample cash flow to fund a plan of reorganization or make adequate protection payments. Furthermore, the Court does not find the Debtors filing for bankruptcy shortly after the entry of the preliminary injunction evidences bad faith on their part. It is axiomatic that "[a]lmost every bankruptcy case is filed because a creditor is pursuing a debtor, whether it be calls from debt collectors, repossessions, suits on unsecured debt, or residential foreclosures." *In re Uche*, 555 B.R. 57, 62 (Bankr. M.D. Fla. 2016) (quoting *In re Bushyhead*, 525 B.R. 136, 149 (Bankr. N.D. Okla. 2015)).

While a close case, in considering the facts and circumstances presented, the Court finds that Black Butte demonstrated by a preponderance of the evidence that the petitions were not filed in good faith, and the Debtors failed to rebut that showing. The Court is convinced that the Debtors filed for bankruptcy to utilize § 365 to reject the Sale Agreement with Black Butte and to have this Court resolve questions of validity, enforceability, and remedies/damages, rather than the state court. The Court understands the Debtors' motivations. They made numerous allusions in their filings to the fact that specific performance is not an available remedy once an agreement has been rejected

under § 365.[39]  This would satisfy the Debtors' objective of not selling to Black Butte, a

party they assert they no longer want anything to do with.  Inc. Doc. No. 105, p. 6.

Standing alone, the Debtors' desire to reject the Sale Agreement is not itself

suggestive of bad faith.  *In re Spoverlook, LLC*, 560 B.R. 358, 365 (Bankr. D.N.M. 2016)

("In general, filing a bankruptcy case to reject a lease or executory contract is not bad

faith.  *See, e.g., In re Balboa St. Beach Club, Inc*., 319 B.R. 736, 740 (Bankr. S.D. Fla.

2005) (collecting cases and noting: 'there is no such thing as 'bad faith' in bringing a

bankruptcy case solely for the purposes of rejecting an overly burdensome executory

contract'")).  Bankruptcies are filed to utilize the provisions of the Bankruptcy Code, and

some of these provisions, including § 365, can upset the expectations of creditors.  *See

Platinum Cap., Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070,

1074-75 (9th Cir. 2002).  But, to utilize these provisions a debtor must have a valid

bankruptcy purpose.  *See NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In

re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 119-20 (3d Cir. 2004).  Often that

purpose is expressed as financial distress or need, *see, e.g., In re Jack*, 471 B.R. 252, 256

(Bankr. D. Nev. 2012), which is how the Debtors generally justified their bankruptcy

filings.

---

[39]  LLC Doc. No. 41 & Inc. Doc. No. 64, p. 7 & 10; LLC Doc. No. 83 & Inc. Doc. No. 105, p. 16-17;
LLC Doc. No. 28 & Inc. Doc. No. 43, p. 6-7.  In particular, the Debtors cite the Ninth Circuit's *In re Rega
Props., Ltd.* decision where it reflected on the purpose of rejection under § 365, observing that  "the
Fourth Circuit recently held that specific performance was not an available relief under section 365
because 'it would undercut the core purpose of rejection.'  Similarly, allowing recovery of the contract
price would also undercut the purpose of rejection under section 365."  894 F.2d 1136, 1140 (9th Cir.
1990).

MEMORANDUM OF DECISION–29

As stated by the Ninth Circuit BAP, "[n]either insolvency nor inability to pay debts is a prerequisite to seeking voluntary relief under the Bankruptcy Code." *In re Stolrow's Inc.*, 84 B.R. 167, 171 (9th Cir. BAP 1988).[40] Yet, "when assessing a debtor's good faith the bankruptcy court 'should examine the debtor's financial status [and] motives….'" *Sullivan v. Harnisch (In re Sullivan)*, 522 B.R. 604, 615 (9th Cir. BAP 2014) (citing *Idaho Dep't of Lands v. Arnold (In re Arnold)*, 806 F.2d 937, 939 (9th Cir. 1986)).[41]

Here, despite the Debtors' gloomy portrayal of their financial condition, the Court finds they were on secure financial ground as of the petition date. The Debtors were current on their obligations with their only secured creditor, AgWest, and they did not identify any impending defaults. Further, their initial schedules only identified two unsecured creditors: Black Butte and their state court attorney in the pending litigation with Black Butte. Black Butte is primarily seeking specific performance in the state court action and no indication was made that the Debtors could not pay Mr. Edson.[42] The

---

[40] *See also In re Marshall*, 300 B.R. 507, 512-13 (Bankr. C.D. Cal. 2003) ("It is not uncommon for debtors to be solvent under the balance sheet test, and yet to have severe financial problems. … The United States bankruptcy law is designed to provide relief from creditor pressures for debtors with cash flow difficulties, even where they are clearly solvent under a balance sheet test.").

[41] Unlike other circuits, the Ninth Circuit has not announced an explicit financial distress requirement for debtors to file a good faith bankruptcy. *See LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint (In re LTL Mgmt., LLC),* 64 F.4th 84, 104 (3d Cir. 2023) (concluding "that financial distress is vital to good faith" in a chapter 11 case and identifying First, Second, Fourth, Fifth, Seventh, Eighth, and Eleventh Circuit decisions where financial distress played a central role in their good faith inquiries).

[42] In fact, Inc.'s SOFA disclosed they paid Mr. Edson $40,000 in the 90 days before filing this case. Ex. 306, p. 25.

MEMORANDUM OF DECISION–30

other unsecured creditors only materialized after Black Butte filed its motions to

dismiss.[43]  These creditors' claims are *de minimis* relative to the size of the Debtors'

overall operations and arose despite Inc. representing on its schedules that it had ample

funds to pay them.  Furthermore, based on Inc.'s projected budget, the Debtors would be

able to satisfy these obligations through their continued operation.  As Doug Kerner

testified, the Debtors will have sufficient water to grow their feed crops, a fact he knew at

least a month before filing.  Further, as conceded by the Debtors in their motion to reject,

the Debtors "can operate, and are now operating, their operation as a successful dairy

operation."  Ex. 304.

   The Court is also not convinced that the state court's preliminary injunction order

presented the Debtors with the "choice of letting their cattle herd deteriorate drastically"

or file for bankruptcy so they could sell surplus feed to fund their operations.  LLC Doc.

No. 41 & Inc. Doc. No. 64.  As Debtors themselves previously argued, the preliminary

injunction may be facially invalid because it does not comply with Idaho Rule of Civil

Procedure 65(d).  It is unclear precisely what it prohibited the Debtors from doing.  Its

intent was to maintain the status quo.  It seems obvious that it would prohibit the Debtors

from selling what Black Butte asserts are the non-fungible assets- the CAFO permits, the

DFA milk shipping rights, and the real property.  But, its impact on the Debtors' sale of

---

[43] While the Court received no direct evidence, it is apparent that the list of unsecured creditors later
added by Inc. arose out of the timing of the petition filing rather than a failure to pay those debts as they
came due.  In other words, because the petition was filed while Inc. was operating a business and
incurring debt, those additional unsecured creditors listed were not a reason for the filing, but rather the
result of filing before the accrued liabilities could be billed and/or paid.

MEMORANDUM OF DECISION–31

feed is less certain. Black Butte's position is that all feed sales to third parties would be prohibited, but that is speculation. No indication was given that the surplus feed the Debtors are currently selling to help fund operations is above what Black Butte asserts is owed to it under the Sale Agreement, and thus potentially subject to the injunction to preserve the status quo.

In addition, if Black Butte is ultimately determined to have a valid, specifically enforceable contract, no evidence was offered that the Debtors' estates or any of their creditors would be financially harmed. That is, the Debtors have not explained what value is being preserved in bankruptcy that would be lost otherwise. No evidence or argument was offered concerning the market value of the assets being sold under the Sale Agreement, or that the $19.8 million sale price was below the fair market value for the assets. Further, no evidence was offered concerning the financial impact of the feed dispute between the parties, that is how costly it would be for the Debtors to fulfill what Black Butte asserts is included under the Sale Agreement versus how much the Debtors assert they are obligated to supply. In addition, the Debtors would receive the down-payment, which while not enough to pay off all their debt to AgWest immediately, would be enough to pay off most of it. There is also no indication that any of the Debtors' unsecured creditors would not be fully repaid. The Debtors would also receive close to a

$1,000,000 annual stream of payments over the next twelve years secured by the real property they sold.[44]

Without more from the Debtors, this is essentially a two-party dispute capable of resolution in the state court.[45]  "Petitions in bankruptcy arising out of a two-party dispute do not per se constitute a bad-faith filing by the debtors." *Sullivan*, 522 B.R. at 616 (citing *Stolrow's,* 84 B.R. at 171).  However, courts find two party disputes to be indicative of bad faith where "it is an apparent two-party dispute that can be resolved outside of the Bankruptcy Court's jurisdiction." *Sullivan*, 522 B.R. at 616 (quoting *Oasis at Wild Horse Ranch, LLC v. Sholes (In re Oasis at Wild Horse Ranch, LLC)*, 2011 WL 4502102 at *10 (9th Cir. BAP Aug. 26, 2011)).  Examples of "typical" features of bad faith two-party disputes include "delays on the eve of trial (litigation tactics), forum shopping, new-debtor syndrome (special purpose entities), repeat filers, and repeatedly delayed foreclosure sales." *Sullivan*, 522 B.R. at 616.

This is not the classic two-party dispute involving a debtor, a secured creditor, and a pending mortgage foreclosure, but as the Court asserted above the Debtors are attempting to use bankruptcy to resolve their one-on-one dispute with Black Butte by rejecting the Sale Agreement and having the bankruptcy court determine the damages

---

[44]  No testimony was offered concerning the value of this real property.

[45]  The Debtors concede this is a two-party dispute, "but not completely."  LLC Doc. No. 27 & Inc. Doc. No. 42, p. 4.  They assert AgWest is affected because its repayment is implicated. *Id.*  In Debtors' closing argument they change course, asserting this is not just a two-party dispute because the dispute affects "the Debtors, their families, their employees, their creditors, their farm lender, and DFA."  LLC Doc. No. 83 & Inc. Doc. No. 105.

caused by rejection.  Without a reorganizational purpose, the Debtors filing to reject the Sale Agreement is just an exercise in forum shopping, intended to defeat Black Butte's specific performance request.

A number of cases with similarities to the matter at hand (*i.e.*, filing for bankruptcy to reject an executory contract without a valid purpose) have held the same. For example, in *In re Chinichian*, 784 F.2d 1440 (9th Cir. 1986), the debtors entered into a contract for the sale of their house, which they later attempted to rescind.  *Id.* at 1441. The creditor sued for specific performance in state court.  *Id.*  Shortly before the trial on specific performance, the debtors filed for bankruptcy.  *Id.*  The bankruptcy court rejected the debtors' chapter 13 plan on bad faith grounds because it determined that the purpose of the plan was to "defeat the state court litigation[.]"  *Id.*  The bankruptcy court identified that:

> The debtors in this case are not the poor, the oppressed and the unfortunate seeking a fresh start. They own a home valued at $140,000 which is encumbered for $40,000 and upon which the payments are current. They also own four parcels of desert acreage free and clear. They are not having difficulty in meeting their financial obligations. Instead, their purpose in-filing [sic] this Chapter 13 case is solely to defeat the pending action for specific performance.

*Id.* at 1445.  The Ninth Circuit affirmed the bankruptcy court's decision, identifying that its findings were supported by the record, and the court properly found these factors "revealed bad faith."  *Id.*

A further example is in *In re Silberkraus*, where a Central District of California bankruptcy court dismissed a chapter 11 bankruptcy as a bad faith filing where it

MEMORANDUM OF DECISION–34

determined that the debtor filed solely to obstruct a pending state court specific performance action.  253 B.R. 890, 902-03 (Bankr. C.D. Cal. 2000).  There, the debtor entered into a lease with a party named Coppersmith for commercial property which gave Coppersmith an option to purchase the property at the end of the lease.  *Id.* at 896-97. Coppersmith exercised its option at the end of the lease, but three days before the close of escrow, the debtor communicated to Coppersmith it would not honor the option.  *Id.* Coppersmith sued the debtor for specific performance.  *Id.*  The bankruptcy court found the debtor's bankruptcy was filed in bad faith because, among other reasons, (i) the debtor "welched" on closing to sell the property three days before the scheduled closing, (ii) the debtor filed for bankruptcy, though solvent, "to obstruct, delay and stay the ongoing pending state court specific performance litigation," and (iii) the debtor forum shopped "to have the bankruptcy court, rather than the state court, determine the validity and enforceability of the option to purchase."  *Id.* at 902-03.

In contrast, in *In re Wells*, a Middle District of Florida bankruptcy court held that a chapter 11 petition filed by a debtor to reject a burdensome executory contract with a purchaser of real property was not a bad faith filing because "the power to reject executory contracts is implicit in the Code, and absent other factors, bad faith will not be implied solely because a debtor files in an attempt to reject a financially burdensome contract."  227 B.R. 553, 562 (Bankr. M.D. Fla. 1998).  The buyer had sued the debtor in state court for specific performance and alleged the bankruptcy was filed in bad faith because, *inter alia*, the debtor's financial problems were "essentially a dispute between

MEMORANDUM OF DECISION–35

the [buyer] and the [debtor] which can better be resolved in state court," and that the

filing was "nothing more than an attempt to get out of a contract that [the debtor] didn't

like." *Id.* at 562-63.  However, the court found the evidence was insufficient to conclude

the debtor filed in bad faith.  The court identified that the debtor's "financial problems

involve[ed] more than [the buyer's] specific performance lawsuit," but rather concerned

"multiple parcels of real property with multiple lien claims by state and federal taxing

authorities and various mortgage holders," and thus would "best be handled by the

bankruptcy code and reorganization provisions of the Code." *Id.*[46]  As to the buyer's

second contention, the court explained that chapter 11 "gives a debtor a second chance

through the reorganization process, which includes the right to attempt reject a potential

executory contract that may be financially burdensome to the estate," and reiterated that

the case was "a multiple asset-multiple creditor bankruptcy which was filed by [the

debtor] for the purpose of dealing with her several creditors through an orderly

liquidation of certain parcels of real estate." *Id.* at 563.[47]

---

[46] The Court also notes that as to the debtor's motion to reject in *Wells*, the court found rejection would benefit the estate and contribute to a successful reorganization because the contract with the buyer provided for a sale price of $900,000, yet the court found its fair market value to be about $1.5 million, and thus the debtor's plan to sell it at a higher price would "allow [the debtor] to retain her other commercial property, help her maintain her living expenses, and ultimately pay her creditors a greater amount." *Id.* at 565.

[47] The court in *Wells* also found the facts before it were distinguishable from the Ninth Circuit's *Chinichian* case discussed above because "in concluding the petition was filed solely to defeat the state court action, [the court in *Chinichian* found] several bad faith factors present, including the fact that the debtors were not financially distressed, had very speculative creditors, and were not having difficulty in meeting their financial obligations." *Id.* at 563 (citing *In re Waldron*, 785 F.2d 936, 940 (11th Cir. 1986); *see also In re Bofill*, 25 B.R. 550 (Bankr. S.D.N.Y. 1982); *In re Marina Enters., Inc.*, 14 B.R. 327 (Bankr.

MEMORANDUM OF DECISION–36

Similarly, in *In re Balboa St. Beach Club, Inc.*, a Southern District of Florida bankruptcy court determined a chapter 11 petition filed by a debtor to reject a contract for the sale of real property was not filed in bad faith. 319 B.R. at 740. Prior to bankruptcy, the debtor and buyer had engaged in five years of expensive litigation concerning the contract, which included a specific performance demand by the buyer. *Id.* at 739. The buyer argued the timing of the filing and the debtor's motion to reject the contract evidenced "an intent to delay or frustrate" its efforts to enforce its rights under the contract. *Id.* at 740. The court identified that filing bankruptcy "for the purposes of rejecting an overly burdensome executory contract," is not bad faith, citing the *Wells* case and several other cases from around the country.[48] *Id.* In response to a contention that the financial problems of the debtor were merely a "dispute between the purchaser and the Debtor which [could] better be resolved in state court" the court explained that as in *Wells*, the debtor's financial problems, though "caused by the five years of protracted litigation between [the debtor] and [the buyer], … now involve other parties." *Id.* at 741. Those problems and parties included (i) the secured mortgage holder, who "filed a mortgage foreclosure action," because the debtor "could not meet its financial obligations due to [the] ongoing litigation" and was seeking stay relief to proceed with its

---

S.D. Fla. 1981) ("holding financially troubled debtors not precluded from using Chapter 7 or 11 solely to avoid executory contract")).

[48] The cases cited were: *In re Marina Enters.*, Inc., 14 B.R. 327 (Bankr. S.D. Fla. 1981); *In re Wells*, 227 B.R. 553, 562-63 (Bankr. M.D. Fla. 1998); *In re Bofill*, 25 B.R. 550, 552 (Bankr. N.Y. 1982); *In re Noonan*, 17 B.R. 793 (Bankr. S.D.N.Y. 1982); and *In re W&L Assoc., Inc.*, 71 B.R. 962, 967 (Bankr. E.D. Pa. 1987).

MEMORANDUM OF DECISION–37

foreclosure, (ii) the city of Hollywood, Florida, "who is a first party secured creditor on the subject property" for its demolition liens placed on the property (iii) the county, who was owed unpaid real estate taxes, and (iv) the Florida Department of Environmental Protection and the Beach Defense Fund, who had "pending administrative litigation … involving the nature of the building on the subject property." *Id.*  The court concluded that the bankruptcy was "much more than a two party dispute," and the debtors' financial difficulties were "best handled by the bankruptcy court and reorganization provisions of the Code." *Id.*

One of the few cases the Debtors cite in support of their good faith is *In re Stolrow's,* 84 B.R. 167.  LLC Doc. No. 41 & Inc. Doc. No. 64, p. 4-6.  They assert that all the contentions of bad faith raised by Black Butte were raised and rejected by the Ninth Circuit BAP.  In *Stolrow's*, the Ninth Circuit BAP affirmed the bankruptcy court's denial of motions to dismiss a trio of chapter 11 cases as bad faith filings.  *Id.* at 172.  The appellant argued the petitions were not filed in good faith "because they were a tactical move by solvent debtors in a shareholder dispute governed by state corporate law[.]"  *Id.* at 170.  The BAP found the cases did "not coincide" with the factors usually present in cases not filed in good faith.  *Id.* at 171.  The BAP observed that insolvency or inability to pay debts is not a prerequisite to filing for bankruptcy, nor are bankruptcies

arising out of two-party disputes per se bad faith filings.  *Id.*[49]  In finding the filings did

"not coincide" with the factors usually present in bad faith cases, the BAP identified:

> The declaration of [the principal of the debtors] filed in opposition to the
> first motion to dismiss stated that the leases for the twelve stores operated
> by the debtors contained a "bankruptcy clause" which would operate to
> terminate the leases if a receiver were appointed and not removed within a
> short period of time. [The principal of the debtors] also contended that if
> the vendors to the [debtor] corporations had received notice of the
> appointment of a receiver as provided in the order issued in state court, they
> would have immediately stopped all shipments to the stores, resulting in
> closure of the stores because of lack of inventory and reduction in the value
> of the corporations for any possible sale. The declaration also stated that the
> [debtor] corporations employed over 100 employees at their stores and
> corporate headquarters, who would presumably lose their jobs if the stores
> were to close.

*Id*.  The BAP concluded, as a result, "there were arguably valid reasons for filing

the petitions in bankruptcy which were accepted by the bankruptcy court."  *Id.*

The Court finds this case, *Wells*, and *Balboa St. Beach Club* distinguishable

because the Debtors have not offered a comparable reason for their bankruptcy filings.

That is, like the debtors in *Chinichian* and *Silberkraus*, the Court is convinced that the

Debtors filed for bankruptcy to reject the Sale Agreement with Black Butte, defeat its

specific performance remedy, and have the Court resolve any damages associated with

the breach.  But, the Court does not perceive a valid bankruptcy purpose that would

justify this aim.  Other than rejecting the Sale Agreement and resolving Black Butte's

---

[49]  *See also In re Gavin*, No. 3:21-BK-30260, 2022 WL 768144, at *5 (9th Cir. BAP Mar. 14, 2022) ("Not
every 'litigation strategy' or delay caused by the filing of a Chapter 13 case constitutes cause for
dismissal when the debtor demonstrates legitimate rehabilitative intent or underlying interests of creditors
that might be served through the Chapter 13 case." (quoting Keith M. Lundin, Lundin on Chapter 13,
§ 152.5, at ¶ [7], LundinOnChapter13.com (last visited March 10, 2022))).

claim it is unclear what if any other purpose Debtors' bankruptcies would serve. "Congress enacted chapter 12 in response to the agricultural debt crisis of the mid-1980s. … The goal in a Chapter 12 case is confirmation of a debt adjustment plan." *In re Mann Farms, Inc.*, 917 F.2d 1210, 1214 (9th Cir. 1990).[50] Here, the only debt potentially in need of reorganization would be whatever Black Butte's claim is if the Debtors reject the Sale Agreement, but that puts the cart before the horse. Accordingly, the Court finds that the Debtors' bankruptcies were not filed in good faith and this dispute should be resolved though the normal litigation process in the state court action.

## Conclusion

For the foregoing reasons, Black Butte's motions to dismiss, LLC Doc. No. 22 & Inc. Doc. No. 36, are granted pursuant to § 1208(c) and the Debtors' motions to reject, LLC Doc. No. 28 & Inc. Doc. No. 43, are denied as moot.

DATED: August 28, 2023



_____
JOSEPH M. MEIER
CHIEF U. S. BANKRUPTCY JUDGE

---

[50] *See also* 165 Cong. Rec. H7438-01, 2019 WL 3366324 ("The special attributes of chapter 12 make it better suited to meet the particularized needs of family farmers in financial distress than other forms of bankruptcy relief.").

MEMORANDUM OF DECISION–40